## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**JOLENE NELSON,**

        **Plaintiff.**

**v.**                                         **No. _____**

**CITY OF ESPANOLA and JOHN RAMON.**     **Demand for Jury Trial**
**VIGIL**

        **Defendants.**

COMES NOW the Plaintiff, by and through her attorney, and for her causes of action states as follows:

**I.      Introduction.**

1. Plaintiff brings this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000(e) et. seq.  Plaintiff contends that Defendants unlawfully terminated her employment with the City of Espanola, in whole or in part, because of her race and/or national origin (Santa Clara Pueblo Tribe Native American) and/or her sex in violation of her rights under federal law. On November 29, 2024, Plaintiff filed her EEOC charge alleging race, national origin and sex discrimination. On December 4, 2025, the EEOC issued a Right to Sue Letter. Plaintiff has exhausted her administrative remedies and her Title VII claims are timely filed. Defendant is liable under respondeat superior for the violations of said federal statute committed by its officials and supervisory employees. Additionally, Plaintiff claims that Defendants' discriminatory conduct violated both 42 U.S.C. §1981 and 42 U.S.C. §1983 because her employment was terminated, in whole or in part, because of her race.   Plaintiff further alleges that she was terminated, in whole or in part, because of her association with the Santa Clara Pueblo, an association protected by the First and Fourteenth Amendments to the United States Constitution, in violation of 42 U.S.C. §1983.

2. Plaintiff further seeks damages under the New Mexico Whistleblower Protection Act, 1978 NMSA, §10-16-C 3(A) and 3(C).

3. Plaintiff seeks money damages under both her federal and state law claims.

**II. Parties and Jurisdiction.**

4. Jurisdiction over the federal claims is proper under 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. §2000e-5(f)(3). Supplemental jurisdiction over the state claim is proper under 28 U.S.C. § 1367 because the state claims are so related to the federal claims that they are part of the same case or controversy and derive from the same common nucleus of operative fact. Venue is proper in New Mexico pursuant to 28 U.S.C. § 1391(b) because the events giving rise to the claims occurred in this district and pursuant to 42 U.S.C. §2000e-5(f)(3) because the unlawful employment practices alleged in this complaint were committed in this District.

5. Plaintiff Jolene Nelson is a 62-year-old Native American woman who, by ethnicity and ancestry, is a member of the Santa Clara Pueblo tribe. Plaintiff resides in the Santa Clara Pueblo. As a Native American, Plaintiff is, obviously, not a white person. Plaintiff was employed as the Community Development Director for Defendant City of Espanola from June 2023 until February 5, 2024.

6. Defendant City of Espanola is a municipal corporation under the laws of the State of New Mexico. Pursuant to §3-13-3 NMSA (1978), Defendant employs a city manager who is vested with the duties and powers referred to in that statute. Defendant is a public employer within the meaning of the New Mexico Whistleblower Protection Act, 1978 NMSA, §10-16-C 3(A) and 3(C). Its office is located in Rio Arriba County, New Mexico. Defendant City of Espanola possesses final policy and decision-making authority over the hiring and firing decisions of its employees. Upon information and belief, Plaintiff alleges that the City of Espanola has more than 100

employees. At all times material hereto, the City of Espanola officers and employees mentioned in this Complaint were acting within the scope of their duties. The acts complained of occurred in Rio Arriba County.

7. Under the 42 U.S.C. §2000e-5(f)(3) and New Mexico Whistleblower Protection Act the City of Espanola is liable for the discriminatory and the retaliatory actions undertaken by its employees alleged herein either directly or under the doctrine of respondeat superior. Upon information and belief, at all times material hereto, Defendant employed more than 100 employees.

8. Defendant John Ramon Vigil was at all times material hereto the mayor of Espanola. He is sued in both his individual and official capacities under 42 U.S.C. §1981 and 42 U.S.C. §1983.

**III. Statement of the Facts.**

**A. Defendant Vigil Has Historically Usurped the Powers of the City Manager and has Exercised De Facto and Ultimate Power in Regard to Employment Decisions at the Defendant City of Espanola.**

9. During all times material hereto, during his tenure as mayor, Defendant Mayor John Ramon Vigil ("Defendant Vigil") engaged in a pattern and practice of involving himself in decisions to hire employees, to give raises to employees and to terminate employees. For example:

a. Defendant Vigil repeatedly forced or attempted to force former City Manager Jordan Yutzy to hire, terminate and/or give pay raises to unqualified individuals, including but not limited to Defendant Vigil instructing him to give a pay raise to Jeremy Maestas despite Mr. Maestas' poor job performance.

3

b. Defendant Vigil subsequently ordered City Manager Yutzy to give Mr. Maestas an additional job title to justify the raise, even though Mr. Maestas never performed the duties of the additional job.

c. Defendant Vigil instructed City Manager Yutzy to allow Mr. Maestas to be eligible for re-hire after Mr. Maestas resigned without providing notice despite the fact that under Espanola City ordinances persons who resign without notice are ineligible for rehiring.

d. Defendant Vigil wanted City Manager Yutzy to hire a particular individual as IT Manager and instructed Human Resources Director Sally Baxter to keep City Manager Yutzy off the interview committee despite the fact that the City Manager usually sat on it. Defendant Vigil did this in order to orchestrate the hiring of this person as a political favor.

e. Defendant Vigil demanded that City Manager Yutzy fire the current IT Manager, not because of poor job performance, but because Defendant Vigil thought the employee "was an asshole."

f. Defendant Vigil demanded that City Manager Yutzy hired an unqualified person as the Grants Administrator.

g. Defendant Vigil subjected Laura Rendon, who provided administrative support to Defendant and to City Manager Yutzy, to a constructive discharge as a result of harassing conduct which violated her right to be free from gender-based discrimination

h. Defendant Vigil told City Manager Yutzy that when he brings the city manager a job applicant, he expects that person to be hired.

i. Defendant Vigil suspended Mr. Yutzy from his position as City Manager shortly after Mr. Yutzy hired Plaintiff in violation of an Espanola City ordinance that states that "The City

4

Manager, City Clerk, City Attorney, Police Chief and Fire Chief are subject to discharge or suspension only by the City Council".

j. Defendant's improper actions to determine employment decisions were noted by at least one member of the Espanola City Council shortly after Defendant summarily suspended Mr. Yutzy from his position as City Manager.

**B. The Facts Evidencing Defendant Vigil's Discriminatory Animus Towards Plaintiff.**

10. Plaintiff Jolene Nelson ("Plaintiff") applied for and was qualified for the position of Espanola Community Development Director and was hired for that position by Defendant Espanola City Manager Jordan Yutzy on or about June 26, 2023.

11. Defendant Vigil expressly told City Manager Yutzy that he did not want Plaintiff hired because she was a member of the Santa Clara Pueblo tribe. Defendant stated that because Plaintiff was a Santa Clara Tribal member, she was untrustworthy. Defendant Vigil further told City Manager Yutzy that because Plaintiff was a member of the Santa Clara Pueblo, having her work at the City of Espanola "would be like putting a fox in the hen house."

12. On June 28, 2023, two days after City Manager Yutzy hired Plaintiff, City of Espanola Human Resources Director Sally Baxter told Mr. Yutzy that Defendant Vigil was "irate" that he had hired Plaintiff because she was a member of the Santa Clara Pueblo.

13. On the afternoon of June 28, 2023, City Manager Yutzy was called to a meeting with Defendant Vigil. Mr. Yutzy told Defendant Vigil that as mayor he did not have the power to hire and fire employees such as Plaintiff. Defendant Vigil expressly told City Manager Yutzy that he, in fact, had the authority to do so. Defendant Vigil then told Mr. Yutzy that he was suspended from his position as City Manager and took his keys from him. Mr. Yutzy was suspended, in whole or in part, because he had hired the woman from Santa Clara Pueblo

5

(Plaintiff). Mr. Yutzy's contract was not renewed after the suspension ended. Sally Baxter, the City Human Resources Director, became Acting City Manager.

14. Prior to the suspension, Mr. Yutzy told City Finance Director Robert Corabi about the racially derogatory statements that Defendant Vigil had made about Plaintiff and her employment at Defendant City. Mr. Yutzy told this to Mr. Corabi at the time those statements were made by Defendant Vigil.

15. On July 23, 2023, Defendant Vigil told Ms. Baxter (then the Acting City Manager) "in a very loud and clear voice: 'The Native American woman needs to be fired." This statement was overheard by Mr. Corabi. According to Mr. Corabi, Defendant Vigil was referring to Plaintiff as she was the only Native American woman who was a department head.

16. After Plaintiff was hired by Mr. Yutzy as the Community Director for Defendant City, Defendant Vigil repeatedly demonstrated his unlawful animus towards Plaintiff by treating her in a manner consistent with his discriminatory intention that Plaintiff was not to be employed with the City because she was a member of the Santa Clara Pueblo and was a woman. Defendant Vigil was cold toward her; Defendant ignored her as much as he could; Defendant even refused to return Plaintiff's greetings when she would greet him.

17. Additionally, as further harassment Plaintiff was denied the use of City vehicles when needed to perform her job duties and was also denied reimbursement for milage when she had to use her private vehicle for City business, in violation of City procurement and purchasing policies.

**C. The Unlawful Discriminatory and Retaliatory Discharge of Plaintiff.**

18. During August or September 2023, Defendant Vigil selected Eric Lujan to replace Jordan Yutzy as the City Manager. Mr. Lujan had no experience as a city manager and was

6

hired because Defendant Vigil understood that, especially in view of the recent example of Mr. Yutzy's fate, Mr. Lujan would do his bidding on employment matters and elsewhere in order to keep his job, that Mr. Lujan would be his "cat's paw."

19. Mr. Lujan treated Plaintiff in a manner consistent with Defendant Vigil's expressed intention to remove Ms. Nelson from her job because she was a woman and a member of the Santa Clara Pueblo. For example: a) Plaintiff repeatedly asked for support and direction from Mr. Lujan but never received any response from him; b) Plaintiff asked Mr. Lujan to meet with her several times and he repeatedly refused to do so; c) Mr. Lujan was rude to her; d) Mr. Lujan excluded Plaintiff from meetings involving economic/community development, an area that her job involved, and e) obstructed her from completing the vetting process for a green system-built manufacturing company that was looking to come to New Mexico and was considering Espanola as a possible site.

20. Prior to November 28, 2023, Defendant City of Espanola suffered from an excessively high crime rate. This included a high rate of theft from retail stores. During January 20, 2023, KRQE reported that Defendant Vigil had requested assistance from the State of New Mexico because of the rising crime rate. The article stated that Espanola was "facing a rise in crime like no other." The article stated that Defendant Vigil was asking the governor to send help and had stated: "We've been experiencing in property crime such as vagrancy, shoplifting, drug trafficking, catalytic converter thefts. It's been hitting on all new records that are typically, it's been, it's exponential growth."

21. On or about June 22, 2023, only days before Plaintiff was hired, local business employees met with City officials to discuss the rampant crime in Espanola and the negative

7

impact it had on local businesses.   Inter alia, Art Wood, General Manager of the Walmart Supercenter in Espanola, stated that shoplifting was a "huge" problem for local businesses.

22. During September 2023, Plaintiff spoke with and/or met with various businesses in the city who complained to her about the lack of adequate police presence and protection by the Espanola Police Department. This included the manager of Walmart and the Lowes Asset Protection Safety Manager, the two largest retail stores in Espanola. This concern was also shared by Food King and CVS. Plaintiff had worked with the Aaron Farmer, the president of The Retail Coach LLC, a contractor hired by the Defendant City to assist with bringing new businesses into the City.  At one point Mr. Farmer told Plaintiff that several businesses, including Ross and similar retail stores, were deterred from coming into Espanola due to the high rate of crime in the city.  Based on the information Plaintiff had received, Plaintiff believed in good faith that Defendant City was grossly mismanaging both the manner in which it was allocating resources for the police department and how current resources were being managed.  Plaintiff believed this mismanagement had resulted in inadequate law enforcement presence and protection which was deterring new businesses from moving into the city and which, in turn, had an adverse impact on the City's ability to increase its tax base and to its ability to provide increased job opportunities for residents in an area of high unemployment.

23. In order to bring this matter to the attention of the City officials and the public, on November 28, 2023, Plaintiff reported to the Espanola City Council at an open meeting that the high rate of theft in the city made it difficult to convince new businesses to come there.

24. Espanola Personnel Policy 3.3(A) requires that "all newly hired employees…enter a probationary period.  During the probationary period, an employee is required to demonstrate suitability for the position through actual work performance." The probationary period is six

8

months.    Plaintiff began work for the City of Espanola on June 26, 2023.  Her six-month probationary period ended on December 26, 2023.  During this time period, Plaintiff was not subjected to any form of corrective action or disciplinary action whatsoever. Under Espanola City policy, Ms. Nelson could not have successfully completed her six-month probationary period if her work performance had demonstrated her unsuitability for the job.

25.  In fact, from June 26, 2023, up until January 19, 2024, Plaintiff had not been subjected to any discipline, received any letters or written directives stating there were any issues with her work or criticizing her work, or receive any type of corrective action. Nor did Plaintiff receive any negative job performance evaluations of any sort.

26.  On January 19, 2024, Mr. Lujan drafted a memo to Plaintiff and ordered her to respond to it by the end of the work day on January 23, 2024.  Plaintiff did not receive the memo until January 22, 2024. In the memo Lujan alleged that Plaintiff's report to the City Council two months earlier wherein she stated that Espanola had a high rate of theft crime which made it difficult to attract new businesses, was untruthful.  He demanded that Plaintiff "fully justify" the statement.

27. Plaintiff's report was truthful. Statistics from Defendant City's police department showed a substantial increase in retail store theft from 2021 to 2023. Plaintiff responded to Mr. Lujan on January 23, 2024. Plaintiff explained that she had met with the manager of the local Walmart and two members of his Asset Protection staff on August 10, 2024.  At the meeting, Walmart had complained of the high theft rate in the store and the need for greater police presence by the City Police Department to help reduce this problem. Plaintiff further explained that she had met with the Asset Protection and Safety Manager of the local Lowe's store who also complained about the increasingly high rate of theft from their store in Espanola, even

9

stating that a small tractor had been stolen. Additionally, Plaintiff explained that in her first meeting with Aaron Farmer, the president of The Retail Coach, a contractor hired by the City to assist with and advise on economic development for the City, Plaintiff was told that businesses like Ross and other retail stores were not considering coming to Espanola but if the City "could show that the shoplifting statistics were-on a downward trend" the City would be able to attract such businesses.

28. Prior to receiving the memo from Mr. Lujan on January 22, 2024, Plaintiff had gone onto the internet and reviewed Espanola crime statistics that were available there. Plaintiff had requested the statistical information from the City Police in December 2023 but did not receive that information until sometime in January 2024. Plaintiff went back to the internet and attached statistical information that she had previously reviewed to her response to Mr. Lujan. Those statistics, which went through 2020, showed that during the years 2017 through 2020, property crime and thefts rates in the City of Espanola were astronomically higher than those rates state-wide and nationwide. Moreover, as stated above the City's own statistics confirmed a substantial increase in theft crimes at retail stores during the 2021-2023 time period, a fact that Mr. Lujan, as City Manager, must have known before he sent the memorandum to Plaintiff.

29. Additionally, in her January 23, 2024, Response to Mr. Lujan Plaintiff listed a number of common-sense steps that business owners had suggested to her that the City police could do that would help bring down the high theft rate. This included having City police drive through the parking lots of different businesses and even park in front of a business while eating lunch. Plaintiff informed Mr. Lujan that she would convey this information to Chief of Police Garcia.

30. At no time between January 22, 2024, the date Mr. Lujan received Plaintiff's response to his January 19, 2024 memorandum, and February 5, 2024, did Mr. Lujan make any attempt to meet with Plaintiff to provide any direction or guidance or even to review or discuss the response he had directed Plaintiff to submit to him on January 23, 2024.

31. On January 22, 2024, Mr. Lujan issued a second memorandum to Plaintiff. In this memorandum Lujan ordered Plaintiff to provide a report to him by February 2, 2024 to address her accomplishments, ongoing efforts, and goals in promoting economic development. The memo did not contain any critique of any aspect of her work.

32. On February 2, 2024, Plaintiff submitted a lengthy and detailed response which summarized her tasks, her goals and her efforts to implement and realize those goals. Inter alia, because of the importance of the film industry, Plaintiff explained her successful effort to repair the damaged relationship between Defendant City and New Mexico Film Office and the New Mexico Tourism Office. Plaintiff explained the work she had done to get the grant application to the United States Department of Energy completed and sent in a timely manner, despite not being told she was to get this done until only one day before it was due. Plaintiff's work on this was a collaborative effort with two other City Department heads. Plaintiff further documented the work she did with Walmart, Lowe's, CVS, Subway, Food King and other businesses in the City to devise strategies to reduce crime. Additionally, Plaintiff specifically explained what she had been doing regarding the development of City owned property, including her work with Rebecca Seawall, the City's Planning and Land Use Director, to develop the Hunter Market.

33. In regard to the latter project, Plaintiff did considerable research on food market guidelines and developed new guidelines that would be a good fit for the City of Espanola. She did community outreach and sought out vendors to participate in the market. Plaintiff worked

with Director Seawall on fixing up the area where the market was to be. They sent out flyers to the general public and did feasibility interviews. Plaintiff was able to get one business to donate the "Hunter Market" banner. In fact, City Planner Rebecca Seawall and Ms. Nelson worked together extremely well.

34. Additionally, Plaintiff attended the monthly Economic Development meetings with the Regional Development Corporation (included the City of Santa Fe, Taos, Los Alamos County, Las Vegas, and Rio Arriba County). These meetings were very helpful in assisting her with projects she was working on. Plaintiff got along with staff at the City. She was cordial to everyone. Plaintiff worked well with the two pueblos, Ohkay Owingeh and Santa Clara Pueblo, and worked well with numerous state agencies, including Tourism, Film, North Central Economic Development Department, New Mexico Finance Authority, WIN program, Department of Workforce Solutions, Los Alamos National Laboratories, Los Alamos County Economic Development Director, Regional Development Corporation, City Businesses, and with Netflix for a series they filmed in Espanola.

35. In her February 2, 2024 response to the Lujan memo, Plaintiff noted the lack of support and direction she had received from Mr. Lujan and the fact that she had requested to meet with Mr. Lujan to discuss her accomplishments and goals but he had refused or otherwise failed to do so. She noted the lack of feedback she had received from him and asked for support and direction from Mr. Lujan to discuss matters surrounding her work.

36. City Manager Lujan's failure to provide Plaintiff with direction and support and his failure to meet with her when requested had hindered Plaintiff's ability to further economic development in the City of Espanola.

37.  However, as he did with Plaintiff's January 23, 2024 response to his prior memorandum, City Manager Lujan made no attempt to review the content of Plaintiff's detailed February 2, 2024, response with her.  He made no attempt to discuss it in any manner. Mr. Lujan's conduct violated basic management procedure would dictate that a city manager with legitimate intentions would have met with his subordinate employee to discuss the information she provided and explain any concerns he had with the responses he had requested.

38. In fact, Mr. Lujan had no intention to discuss any aspect of Plaintiff's job performance or try and point out areas that he believed needed improvement. The failure of the City Manager to review and discuss with Plaintiff the content of her two responses that he had ordered her to submit and discuss them with her evidences the fact that the issuance of his two memorandums was pretextual and was merely an attempt to "paper the record" before firing Plaintiff.

39.  Mr. Lujan's conduct toward Plaintiff was not consistent with that of a city manager acting in good faith to improve a subordinate's work performance. Rather, it was consistent with the behavior of a manager who, in the absence of any good faith basis, intended to carry out the instruction of his boss to "get rid" of this subordinate regardless of her work performance.

40.  On February 5, 2024, the first day work after the weekend, Plaintiff was issued a Notice of Termination, stating that she was fired.  The letter did not point to any particular areas of wrongdoing or improper job performance.  Rather, it simply alleged: "The performance of your duties has not been satisfactory." While the letter was signed by Mr. Lujan, Mr. Lujan was simply serving as the "cat's paw" to carry out the will of Defendant Vigil.

41. Plaintiff was replaced as Community Director by Michael Adams. Mr. Adams was not a Native-American and was not a woman. While the City of Espanola would not provide Plaintiff with a city vehicle to use for work related purposes, Mr. Adams was provided a vehicle.

42. Defendant City's proffered explanation that Plaintiff' performance of her duties was not satisfactory was false and was a mere pretext to conceal the fact that Plaintiff was terminated, in whole or in part, because of race and ancestry and/or because of her national origin and/or because of her protected association with the Santa Clara Pueblo and/or because she was a female member of the Santa Clara Pueblo and the discriminatory intent of Mayor Vigil was carried out by his city manager and was a substantial motivating factor for the firing.

43. Additionally, Plaintiff was terminated by Defendant City, in whole or in part, because she reported to the Espanola City Council on November 28, 2023, that the high crime rate in Espanola was deterring new businesses from coming into the city. Defendant's claim that her work performance was not satisfactory was a pretext to retaliate against her for speech that was protected by the New Mexico Whistleblowers Act.

44. Additionally, Plaintiff was terminated, in whole or in part, because of her association with her tribe, the Pueblo of Santa Clara, an association that was protected by the First and Fourteenth Amendments to the United States Constitution.

45. The following direct and indirect evidence demonstrates unlawful animus behind the termination of Plaintiff and the pretextual nature of Defendant's proffered explanation for her firing:

    a. Defendant Vigil historically involved himself in employment decisions, often usurped the authority of the city manager in the making of numerous employment decisions and told former City Manager Yutzy that he had the power to hire and fire employees.

    b. Defendant Vigil expressly told former City Manager Yutzy that he did not want Plaintiff hired because she was a female member of the Santa Clara Pueblo Tribe.

c. Defendant Vigil told City Manager Yutzy that because Plaintiff was a Santa Clara Pueblo, she was untrustworthy and that having her work for Defendant City "would be like putting a fox in the hen house."

d. City of Espanola Human Resources Director Sally Baxter told City Manager Yutzy that Defendant Vigil was "irate" that he had hired Plaintiff because she was a member of the Santa Clara Pueblo.

e. While he was still the active City Manager, Mr. Yutzy informed City Finance Director Robert Corabi of the racially derogatory statements Defendant Vigil had made about Plaintiff and her employment at Defendant City and did so immediately after those statements were made by Defendant Vigil.

f. On July 23, 2023, Defendant Vigil told Ms. Baxter (then the Acting City Manager): 'The Native American woman needs to be fired," a statement overheard by Mr. Corabi. Plaintiff was the only Native American woman who was a department head.

g. Defendant Vigil suspended Mr. Yutzy from his position as City Manager shortly after Mr. Yutzy hired Plaintiff and his contract was not renewed, in whole or in part, because he had hired "the woman from Santa Clara."

h. After Mr. Yutzy hired Plaintiff, Defendant Vigil was cold toward her, ignored her as much as he could and even refused to return Plaintiff's greetings when she would greet him.

i. Eric Lujan was hired to replace Mr. Yutzy as city manager. Mr. Lujan had no prior experience as a city manager, was not qualified for the position and was aware or soon became aware of the fact that Defendant Vigil had a history of involving himself in hiring and firing decisions at the City and had suspended Mr. Yutzy.

j. Plaintiff was denied the use of City vehicles when needed to perform her job duties and was denied reimbursement for milage when she had to use her private vehicle for City business.

k. Plaintiff satisfactorily completed her six-month probation period without any corrective action or disciplinary action or negative written performance evaluations of any type.

l. Prior to January 19, 2024, Plaintiff had never been informed by her supervisors that her work performance was not satisfactory.

m. Mr. Lujan treated Plaintiff in a manner consistent with Defendant Vigil's expressed intention to remove Plaintiff from her job because she was a woman and a member of the Santa Clara Pueblo: Plaintiff repeatedly asked for support and direction from Mr. Lujan and he repeatedly failed to do so; Mr. Lujan was rude to her; he excluded Plaintiff from meetings involving economic development, an area that her job involved; he obstructed her from completing the vetting process for a green system-built manufacturing company that

15

was looking to come to New Mexico and was considering Espanola as a possible site and he did not make any attempt to meet with Plaintiff to discuss her responses to his two January 2024 memorandums.

n. At no time after Plaintiff submitted her responses to either of Mr. Lujan's two January 2024  memorandums, did Mr. Lujan speak with Plaintiff to discuss her responses or any issues he may have had with her responses or offer any type of suggested improvement in her work that he thought she should make.

o. Prior to being fired on February 5, 2024, Plaintiff had never received a verbal warning or a written warning or a reprimand despite the requirements of Section 10.2 of the City of Espanola Personnel Policy which strongly states that the City "promotes a system of progressive counseling to be used with employees who violate or fail to comply with City policies, procedures and rules or who have other performance problems."

p.  The two memorandum issued to Plaintiff were issued after Plaintiff's statement at the November 28, 2023, public meeting  where she informed the Espanola City Council that the City of Espanola had a high crime rate which was impacting on the willingness of businesses to come to the city was a true statement.

q. Plaintiff was replaced as Community Director by Michael Adams. Mr. Adams was not a Native-American and was not a woman.

r. While the City of Espanola would not provide Plaintiff with a city vehicle to use for work related purposes, Mr. Adams was provided a vehicle.

46. The above listed facts are facts from which it may be reasonably inferred that Ms. Nelson's job performance was not unsatisfactory and that the content of Ms. Nelson's responses to the two memorandum issued by City Manager Lujan was irrelevant because Mayor Vigil, who had forced out Mr. Yutzy, the city manager who had hired Ms. Nelson, had made clear to his successor that Ms. Nelson was to be terminated.

### COUNT 1- CLAIMS FOR RELIEF BASED ON THE VIOLATION OF FEDERAL AND  STATE STATUTORY LAW PROHIBITING CLASS-BASED DISCRIMINATION.

47.  Defendants' termination of Plaintiff was motivated, in whole or in part, by racial animus due to her ancestry, ethnicity and race as a Santa Clara Pueblo tribal member and constituted race discrimination. The conduct of Defendants described in this Complaint violated rights secured to Plaintiff by 42 U.S.C. §2000e-2 and -3, and by 42 U.S.C. §1981,

16

48. Defendants' termination of Plaintiff was motivated, in whole or in part, by her national origin and constituted national origin discrimination. The conduct of Defendants described in this Complaint violated rights secured to Plaintiff by 42 U.S.C. §2000e-2 and -3; by 42 U.S.C.§1981 and by 42 U.S.C.§1983.

### COUNT II- CLAIM FOR RELIEF BASED ON SECTION 1983 FOR THE VIOLATION OF PLAINTIFF'S FIRST AND FOURTEENTH AMENDMENTS RIGHT TO FREEDOM OF ASSOCIATION

49. Plaintiff incorporates by reference all the allegations contained in paragraphs 1-46 above.

50. Plaintiff was fired because she exercised his First Amendment right to association, which included her right to associate with members the Santa Clara Pueblo Tribe.

51. At all times material hereto, Defendant Vigil acted in concert with Eric Lujan to violate Plaintiff's First Amendment rights. Defendant acted intentionally and/or with deliberate indifference in causing Plaintiff to be fired for exercising her right to free association as described above in this complaint.

52. Plaintiff's constitutional right to be free to associate with her Tribe and its members, culturally, ethnically, and socially without being subjected to discriminatory and/or retaliatory actions for that association by government officials was clearly established at the time of Defendant Vigil's conduct.

53. At all times material hereto Defendants Vigil and City of Espanola maintained an unwritten custom, policy and pattern of practice which permitted or condoned the making of employment decisions, including hiring and termination, for discriminatory and retaliatory reasons, including the association with groups or individuals who Defendant Vigil did not like

for reasons of race, national origin or political beliefs and/or the failure to associate politically with Defendant Vigil.

### COUNT III-CLAIM FOR RELIEF BASED ON THE VIOLATION OF THE NEW MEXICO WHISTLEBLOWER ACT.

54. Plaintiff incorporates by reference the allegations contained in paragraphs 1-46 above.

55. Plaintiff was terminated, in whole or in part, because of statements made in a public Espanola City Council meeting on November 28, 2023, wherein Plaintiff reported to the Espanola City Council and to the public that there was a high rate of theft in the city and this high rate of theft was making it difficult to convince new businesses to come there. Plaintiff had a good faith belief that this problem was caused by the gross mismanagement of the City Police Department, including its failure to provide an adequate police presence and police protection to businesses in the city. Plaintiff made the statement in order to bring this serious matter, which was limiting the city's tax base and the ability to provide jobs to its citizens, to the attention of the City and the public.

56. The statement was made by Plaintiff while she was an employee of Defendant City and was conduct protected by Section 10-16-3(A) NMSA (1978).

### DAMAGES

57. As a direct and proximate result of the conduct of Defendants, Plaintiff suffered and continues to suffer severe emotional distress, anxiety, humiliation, embarrassment, loss of income, and the violation of her federal statutory and constitutional rights.

58. At all times material hereto, each of the Defendants acted intentionally, willfully, with deliberate indifference, with reckless indifference and/or with malice toward the federal and state statutory rights of Plaintiff. For this reason, Plaintiff is entitled to an award of punitive damages

against Defendant Vigil arising under 42 U.S.C.§1981 and 42 U.S.C.§1983.

WHEREFORE, Plaintiff prays for the following relief:

1. For compensatory damages in an amount to be determined by the trier of fact;

2. For punitive damages against Defendant Vigil under Plaintiff's 42 U.S.C. ¶¶1981 and 1983 claims in an amount to be determine by the trier of fact;

3. For pre and post judgment interest;

4. For reasonable attorney's fees and costs under each of the above cited federal and state statutes; and

5. For such other and further relief as the court deems just and proper.

Respectfully Submitted,

/s/ Richard Rosenstock
Richard Rosenstock
1121 Paseo de Peralta
Santa Fe, New Mexico   87501
(505) 988-5324
Fax: (505) 989-4844
richard.rosenstock@gmail.com

Eli Fresquez
5300 Las Soleras Drive, Unit 1533
Santa Fe, NM 87507
505-310-9628
ef@fresquezlegal.com

Attorneys for Plaintiff